**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| MARTIN KARL SCHULZ IV, Derivatively on Behalf of Nominal Defendant CAMPING WORLD HOLDINGS, INC., <br><br> Plaintiff, <br><br> v. <br><br> MARCUS A. LEMONIS, MATTHEW D. WAGNER, THOMAS E. KIRN, BRENT L. MOODY, ANDRIS A. BALTINS, BRIAN P. CASSIDY, MARY J. GEORGE, MICHAEL W. MALONE, K. DILLON SCHICKLI, and KATHLEEN S. LANE, <br><br> Defendants, <br><br> and <br><br> CAMPING WORLD HOLDINGS, INC., <br><br> Nominal Defendant. | Case No. _____ <br><br><br><br><br><br><br><br><br><br> **JURY TRIAL DEMANDED** |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

Plaintiff Martin Karl Schulz IV ("Plaintiff"), by and through his undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant Camping World Holdings, Inc. ("Camping World" or the "Company"), against its Board of Directors (the "Board") and certain of its executive officers seeking to remedy Individual Defendants' (defined below) breaches of fiduciary duties and violations of federal law. Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Defendants' publicly available

documents, conference call transcripts and announcements made by Defendants, United States

Securities and Exchange Commission ("SEC") filings, press releases published by and regarding

Camping World, legal filings, news reports, securities analysts' reports about the Company,

filings in the securities class action captioned *Siverd v. Camping World Holdings, Inc., et al.*,

Case No. 1:26-cv-02710 (N.D. Ill.) (the "Securities Class Action"), and other publicly available

information.

## NATURE OF THE ACTION

1. This is a shareholder derivative action brought by Plaintiff on behalf of Camping

World against certain of its current and former officers and members of the Company's Board (the

"Individual Defendants")[1] for breaches of their fiduciary duties between at least April 4, 2025,

through February 24, 2026, inclusive (the "Relevant Period"), and violations of federal securities

laws, as set forth below.

2. Camping World, together with its subsidiaries, is the largest retailer of recreational

vehicles ("RVs") and related products and services in the United States. Throughout the Relevant

Period, Camping World touted its commitment to executing margin improvement through an

ambitious Selling, General & Administrative ("SG&A") expense reduction plan to better

strengthen its balance sheet. The Company also emphasized its "nimbleness" by utilizing a data-

driven, scientific approach to its inventory management, explaining that its surgical focus on

inventory and similar metrics would help the Company find opportunities to readily exploit.

3. However, in reality, the Company's inventory turnover rates were, at best,

---

[1] The Individual Defendants are Marcus A. Lemonis ("Lemonis"), Matthew D. Wagner ("Wagner"), Thomas E. Kirn ("Kirn"), Brent L. Moody ("Moody"), Andris A. Baltins ("Baltins"), Brian P. Cassidy ("Cassidy"), Mary J. George ("George"), Michael W. Malone ("Malone"), K. Dillon Schickli ("Schickli"), and Kathleen S. Lane ("Lane"). "Defendants" means Camping World and the Individual Defendants.

lackluster. For example, by October 28, 2025, new vehicle revenue had decreased by $58.1 million, or 7%, with average selling prices of new vehicles decreasing by 8.6%, and new vehicle gross margins down 81 basis points to 12.7%. Despite this precipitous decline in new vehicle revenue, the Company reassured investors that 2026 would be a year of Adjusted EBITDA growth and that with "judicious conservatism, combined with our fortified balance sheet and improving leverage," the Company would return to its "measured and accretive M&A activity."

4.　　　On this news, the Company's stock price fell $4.17, or 24.8%, from a closing price of $16.82 on October 28, 2025, to a closing price of $12.65 on October 29, 2025, on unusually heavy trading volume.

5.　　　The truth fully emerged on February 24, 2026, when the Company issued a press release announcing its fourth quarter and full year financial results for 2025 (the "4Q25 Press Release"). In the 4Q25 Press Release, the Company announced, among other things, that it had "***implemented strict corrective inventory management objective to structurally improve [its] turnover rates***"[2] creating gross margin headwinds into 2026. The Company also reported a net loss of $109.1 million in the fourth quarter of 2025, an increased loss of $49.6 million, or 83.3%. Moreover, the Company reported that its new vehicle gross margin had further decreased by 291 basis points, with its used vehicle gross margin also decreasing by 277 basis points, caused by an increase in the average cost per vehicle sold and a decrease in average selling price driven by accelerated sales of used vehicles in December. The Company also announced it would pause its quarterly cash dividend, effective immediately.

6.　　　On this news, the Company's stock price fell $1.79, or 16.5%, from a closing price of $10.85 per share on February 24, 2026, to a closing price of $9.06 per share on February 25,

---

[2] Unless otherwise stated, all emphasis is added.

2026, on heavy trade volume.

7. As set forth herein, the Individual Defendants breached their fiduciary duties by issuing, causing the issuance of, and/or failing to correct the materially false and/or misleading statements and omissions of material fact to the investing public. Specifically, the Individual Defendants failed to disclose to investors, *inter alia*, that: (i) the Company had overstated its ability to adeptly manage its inventory to optimize profitability; (ii) the Company needed to undertake corrective measures on its inventory management systems and processes; (iii) the Company's inadequate systems and processes prevented it from ensuring reasonably accurate disclosures and/or guidance, including, but not limited to, its ability to manage SG&A expenses and maintain a healthy balance sheet; (iv) consumer retail demand was lower than the Company experienced and/or reasonably expected; (v) the Company failed to maintain adequate internal controls and risk oversight mechanisms; and (vi) as a result of the foregoing, the Company's public statements regarding its business, operations, and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

8. As a result of the foregoing, the Securities Class Action was filed against the Company and Defendants Lemonis, Wagner, and Kirn in the United States District Court for the Northern District of Illinois.

9. As a direct and proximate result of the Individual Defendants' misconduct, the Company has incurred significant financial losses, including the cost of defending and paying class-wide damages in the Securities Class Action, as well as additional losses including reputational harm and loss of goodwill.

10. Moreover, in light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in

4

fraud, the substantial likelihood of the directors' liability in this derivative action and Defendants' liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of Camping World's Board cannot consider a demand to commence litigation against themselves and the other Individual Defendants on behalf of the Company with the requisite level of disinterestedness and independence. Accordingly, Plaintiff did not make a demand on the Board because, as further detailed herein, demand would be a futile and useless act.

**JURISDICTION AND VENUE**

11. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. § 78n(a)) and Rule 14a-9 (17 C.F.R. § 240.14a-9) promulgated thereunder by the SEC, Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5), and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)).

12. Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

13. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

14. This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

15. In connection with the acts, conduct and other wrongs complained of herein, the Individual Defendants, directly or indirectly, used the means and instrumentalities of interstate

commerce, the United States mail, and the facilities of a national securities market.

16. Venue is proper in this District pursuant to Section 27(a) of the Exchange Act and 28 U.S.C. § 1391 because Camping World maintains its principal executive offices in this District, Defendants have conducted business in this District, a substantial portion of the acts and omissions alleged herein, including the dissemination of materially false and misleading information, occurred in this District, Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District, and the Securities Class Action is pending in this District.

## **PARTIES**

### *Plaintiff*

17. Plaintiff is, and has been at all relevant times, a continuous shareholder of Camping World.

### *Nominal Defendant*

18. Nominal Defendant Camping World is a Delaware corporation with its principal executive offices located at 2 Marriott Drive, Lincolnshire, Illinois 60069. Camping World's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "CWH."

### *Individual Defendants*

19. Defendant Lemonis is the Company's co-founder and has served as the Company's Special Advisor since January 2026. Defendant Lemonis previously served as the Company's Chairman of the Board and Chief Executive Officer ("CEO") from March 2016 until January 2026. Defendant Lemonis is named as a defendant in the Securities Class Action. According to the Company's proxy statement filed on Schedule 14A with the SEC on April 9, 2026 (the "2026 Proxy"), Defendant Lemonis received $30,404,864 in total compensation from the Company in

6

2025.

20.     Defendant Wagner has served as the Company's CEO, President, and as a director of the Company since January 2026. Defendant Wagner previously served as the Company's Chief Operating Officer from January 2023 to June 2024, and as the Company's President from July 2024 to December 2025. Defendant Wagner is named as a defendant in the Securities Class Action. According to the 2026 Proxy, Defendant Wagner received $1,282,701 in total compensation from the Company in 2025.

21.     Defendant Kirn has served as the Company's Chief Financial Officer since July 2024 and has served as the Company's Chief Accounting Officer since September 2020. Defendant Kirn is named as a defendant in the Securities Class Action. According to the 2026 Proxy, Defendant Kirn received $1,200,000 in total compensation from the Company in 2025.

22.     Defendant Moody has served as a director of the Company since May 2018 and as Chairman of the Board since January 2026. According to the 2026 Proxy, Defendant Moody received $349,973 in total compensation from the Company in 2025.

23.     Defendant Baltins has served as a director of the Company since March 2016. Defendant Baltins also serves as Chair of the Company's Compensation Committee and as a member of the Company's Nominating & Corporate Governance Committee. According to the 2026 Proxy, Defendant Baltins received $272,817 in total compensation from the Company in 2025.

24.     Defendant Cassidy has served as a director of the Company since March 2016. Defendant Cassidy also serves as a member of the Company's Compensation Committee. According to the 2026 Proxy, Defendant Cassidy received $262,487 in total compensation from the Company in 2025.

25. Defendant George has served as a director of the Company since January 2017. Defendant George also serves as a member of the Company's Compensation Committee. According to the 2026 Proxy, Defendant George received $315,289 in total compensation from the Company in 2025.

26. Defendant Malone has served as a director of the Company since May 2019. Defendant Malone also serves as Chair of the Company's Audit Committee and as a member of the Company's Nominating & Corporate Governance Committee. According to the 2026 Proxy, Defendant Malone received $287,487 in total compensation from the Company in 2025.

27. Defendant Schickli has served as a director of the Company since March 2016. Defendant Schickli also serves as Chair of the Company's Nominating & Corporate Governance Committee and as a member of the Company's Audit Committee. According to the 2026 Proxy, Defendant Schickli received $281,553 in total compensation from the Company in 2025.

28. Defendant Lane has served as a director of the Company since March 2024. Defendant Lane also serves as a member of the Company's Audit Committee. According to the 2026 Proxy, Defendant Lane received $267,487 in total compensation from the Company in 2025.

## **FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

29. By reason of their positions as officers and/or directors of Camping World, and because of their ability to control the business and corporate affairs of Camping World, the Individual Defendants owed Camping World and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Camping World in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Camping World and its shareholders.

8

30.     Each director and officer of the Company owes to Camping World and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

31.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Camping World, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

32.     To discharge their duties, the officers and directors of Camping World were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

33.     Each Individual Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Camping World, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

34.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance,

growth, financial statements, products, management, internal controls, earnings, and present and future business prospects, including the dissemination of false and/or materially misleading information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful, accurate, and fairly presented information.

35.     To discharge their duties, the officers and directors of Camping World were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.  By virtue of such duties, the officers and directors of Camping World were required to, among other things:

(i)     Ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Illinois, and the United States, and pursuant to Camping World's own Code of Business Conduct and Ethics ("Code of Conduct");

(ii)     Conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(iii)     Remain informed as to how Camping World conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(iv)     Establish and maintain systematic and accurate records and reports of the business and internal affairs of Camping World and procedures for the reporting of the business

10

and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(v)     Maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Camping World's operations would comply with all applicable laws and Camping World's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(vi)     Exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(vii)     Refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(viii)     Examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

36.     Each of the Individual Defendants further owed to Camping World and the shareholders the duty of loyalty requiring that each favor Camping World's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

37.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Camping World and were at all times acting within the course and scope of such agency.

38.     Because of their advisory, executive, managerial, and directorial positions with Camping World, each of the Individual Defendants had access to adverse, non-public information about the Company.

39.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Camping World.

## CAMPING WORLD'S CODE OF CONDUCT

40.     The Company's Code of Conduct states that it:

[C]ontains general guidelines for conducting the business of the Company consistent with the highest standards of business ethics. To the extent this Code requires a higher standard than required by commercial practice or applicable laws, rules or regulations, the Company adheres to these higher standards.

This Code applies to all of our directors, officers and other employees. We refer to all officers and other employees covered by this Code as "Company employees" or simply "employees," unless the context otherwise requires. In this Code, we refer to our principal executive officer, principal financial officer, principal accounting officer and controller, or persons performing similar functions, as our "principal financial officers."

41.     Under a section titled "Conflicts of Interest," the Code of Conduct states, in relevant part:

Employees and directors must act in the best interests of the Company. You must refrain from engaging in any activity or having a personal interest that presents a "conflict of interest" and should seek to avoid even the appearance of a conflict of interest. A conflict of interest occurs when your personal interest interferes with the interests of the Company. A conflict of interest can arise whenever you, as an employee or director, take action or have an interest that prevents you from performing your Company duties and responsibilities honestly, objectively and effectively. . . .

The Company requires that employees and directors disclose any situation that reasonably would be expected to give rise to a conflict of interest. If you suspect that you have a situation that could give rise to a conflict of interest, or something that others could reasonably perceive as a conflict of interest, you must report it in writing to your supervisor or the Company's Chief Administrative and Legal Officer, or if you are a director or executive officer, to the Board of Directors. The

12

Company's Chief Administrative and Legal Officer or the Board of Directors, as applicable, will work with you to determine whether you have a conflict of interest and, if so, how best to address it. All transactions that could give rise to a conflict of interest involving a director, executive officer or principal financial officer must be approved by the Board of Directors, and any such approval will not be considered a waiver of this Code.

42. Under a section titled "Corporate Opportunities," the Code of Conduct states, in relevant part:

[Y]ou have an obligation to advance the Company's interests when the opportunity to do so arises. If you discover or are presented with a corporate opportunity in the Company's line of business as to which the Company would have an interest or expectancy through the use of corporate property or information or because of your position with the Company and the corporate opportunity is expressly offered to you solely in your capacity as an employee or director of the Company, you should first present the corporate opportunity to the Company before pursuing the opportunity in your individual capacity. No employee or director may use corporate property, information or his or her position with the Company for personal gain or compete with the Company while employed by us.

43. Under a section titled "Company Records," the Code of Conduct states, in relevant part:

Accurate and reliable records are crucial to our business. Our records are the basis of our earnings statements, financial reports, regulatory submissions and many other aspects of our business and guide our business decision-making and strategic planning. Company records include financial records, personnel records, records relating to our technology and product development, customer collaborations and regulatory submissions and all other records maintained in the ordinary course of our business.

All Company records must be complete, accurate and reliable in all material respects. Each employee and director must follow any formal document retention policy of the Company with respect to Company records within such employee's or director's control.

44. Under a section titled "Accuracy of Financial Reports and Other Public Communications," the Code of Conduct states, in relevant part:

As a public company we are subject to various securities laws, regulations and reporting obligations. Both federal law and our policies require the disclosure of accurate and complete information regarding the Company's business, financial

condition and results of operations. Inaccurate, incomplete or untimely reporting will not be tolerated and can severely damage the Company and result in legal liability.

The Company's principal financial officers and other employees working in the finance department have a special responsibility to ensure that all of our financial disclosures are full, fair, accurate, timely and understandable. These employees must understand and strictly comply with generally accepted accounting principles and all standards, laws and regulations for accounting and financial reporting of transactions, estimates and forecasts.

45.     Under a section titled "Compliance with Laws and Regulations," the Code of Conduct states, in relevant part:

Each employee and director has an obligation to comply with all laws, rules and regulations applicable to the Company's operations. These include, without limitation, laws covering bribery and kickbacks, the development, approval, manufacture, marketing and sale of our products, copyrights, trademarks and trade secrets, information privacy, insider trading, illegal political contributions, antitrust prohibitions, foreign corrupt practices, offering or receiving gratuities, environmental hazards, employment discrimination or harassment, occupational health and safety, false or misleading financial information or misuse of corporate assets. You are expected to understand and comply with all laws, rules and regulations that apply to your job position.

46.     Under a subsection titled "Compliance with Insider Trading Laws" under a section titled "Compliance with Laws and Regulations," the Code of Conduct states, in relevant part:

Consistent with the Company's Insider Trading Compliance Policy, the Company's employees and directors are prohibited from trading in the stock or other securities of the Company while in possession of material nonpublic information about the Company. In addition, Company employees and directors are prohibited from recommending, "tipping" or suggesting that anyone else buy or sell the Company's stock or other securities on the basis of material non-public information. Employees and directors who obtain material non-public information about another company in the course of their duties are prohibited from trading in the stock or securities of the other company while in possession of such information or "tipping" others to trade on the basis of such information. Violation of insider trading laws can result in severe fines and criminal penalties, as well as disciplinary action by the Company, up to and including, for an employee, termination of employment or, for a director, a request that such director resign from the Board of Directors.

47.     Under a section titled "Public Communications and Regulation FD," the Code of

14

Conduct states, in relevant part:

The Company places a high value on its credibility and reputation in the community. What is written or said about the Company in the news media and investment community directly impacts our reputation, positively or negatively. Our policy is to provide timely, accurate and complete information in response to public requests (from media, analysts, etc.), consistent with our obligations to maintain the confidentiality of competitive and proprietary information and to prevent selective disclosure of market-sensitive financial data. The Company has adopted a separate Policy Regarding Communications with Analysts, Securityholders and Others to maintain the Company's credibility and reputation in the community, to maintain the confidentiality of competitive and proprietary information and to prevent selective disclosure of market-sensitive financial data.

In connection with its public communications, the Company is required to comply with a rule under the federal securities laws referred to as Regulation FD (which stands for "fair disclosure"). Regulation FD provides that, when we disclose material non-public information about the Company to securities market professionals or stockholders (where it is reasonably foreseeable that the stockholders will trade on the information), we must also disclose the information to the public. "Securities market professionals" generally include analysts, institutional investors and other investment advisors.

The Company has designated certain individuals as "spokespersons" who are responsible for communicating with analysts, institutional investors and representatives of the media. Any employee or director who is not a designated spokesperson of the Company is prohibited from communicating any information about the Company to analysts, institutional investors or representatives of the media.

## CAMPING WORLD'S AUDIT COMMITTEE CHARTER

48.     Camping World's Audit Committee Charter states, in relevant part, that:

The purpose of the Audit Committee (the "Committee") of the Board of Directors (the "Board) of Camping World Holdings, Inc. (the "Company") is to assist the Board in its oversight of: (i) the integrity of the Company's financial statements; (ii) the Company's compliance with legal and regulatory requirements; (iii) the independent auditor's qualifications and independence; (iv) the performance of the Company's independent auditor; and (v) the performance of the internal audit function.

49.     Under a section titled "Duties and Responsibilities," the Audit Committee Charter states, in relevant part:

15

*Annual Financial Statements and Annual Audit* . . .

4.      *Form 10-K Review*. The Committee must review and discuss the annual audited financial statements with management and the independent auditor, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."

5.      *Audit Committee Report*. The Committee must provide the Company with the report of the Committee with respect to the audited financial statements for inclusion in each of the Company's annual proxy statements.

*Quarterly Financial Statements*

6.      *Form 10-Q Review*. The Committee must review and discuss the quarterly financial statements with management and the independent auditor, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."

*Other Duties and Responsibilities*

7.      *Review of Earnings Releases*. The Committee must discuss the Company's earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies.

8.      *Risk Assessment and Risk Management*. The Committee must discuss the Company's policies with respect to risk assessment and risk management, including information security matters and risks, including reviewing information technology procedures and controls and receiving periodic briefings, no less than annually, from senior management on information security matters, including data privacy and cyber-security. . . .

11.      *Complaint Procedures*. The Committee must establish procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters, and for the confidential and anonymous submission by Company employees of concerns regarding questionable accounting or auditing matters.

12.      *Review of Related Person Transactions*. The Committee must review all related person transactions as defined by Item 404 of Regulation S-K on an ongoing basis and all such transactions must be approved or ratified by the Committee.

13.      *Review of Code of Business Conduct and Ethics*. The Committee must periodically consider and discuss with management and the independent auditor the Company's Code of Business Conduct and Ethics (the "Code") and the procedures in place to enforce the Code. The Committee must also consider and discuss and, as appropriate, grant requested waivers from and approvals under the Code brought

16

to the attention of the Committee, though the Committee may defer any decision with respect to any waiver or approval to the Board.

14.   *Reports to the Board of Directors.* The Committee must report regularly to the Board regarding the activities of the Committee.

15.   *Committee Self-Evaluation.* The Committee must at least annually perform an evaluation of the performance of the Committee.

16.   *Review of this Charter.* The Committee must periodically review and reassess this Charter and submit any recommended changes to the Board for its consideration.

## SUBSTANTIVE ALLEGATIONS

*Background*

50.   Camping World, together with its subsidiaries, is the largest RV retailer in the United States. One segment of Camping World's two reportable segments is its RV and Outdoor Retail segment, which includes selling new and used RVs, financing new and used RVs, selling protection and insurance services and plans for RVs, servicing and repairing new and used RVs, installing RV parts, and selling RV and outdoor related products. In 2025, the Company's RV and Outdoor Retail segment accounted for 96.9% of the Company's total revenue. As of December 31, 2025, Camping World operated 196 RV dealerships and service centers across the United States.

51.   Up to and during the Relevant Period, the Company touted its ability to deliver significant growth in used and new vehicles, and that its SG&A plan would mitigate any lower average selling prices or macroeconomic variability the Company may face.

*Individual Defendants' Materially False and Misleading Statements*

52.   On April 4, 2025, the Company filed a proxy statement on Schedule 14A with the SEC (the "2025 Proxy"). The 2025 Proxy assured investors that the Company was sufficiently overseeing risks to the Company, and that the Company had internal controls in place stating, in relevant part:

17

Risk assessment and oversight are an integral part of our governance and management processes. Our management is responsible for our day-to-day risk management activities and the Board and the Board committees have an active role in overseeing management of the Company's risks. The Board will regularly review information regarding the Company's credit, liquidity and operations, as well as the risks associated with each. The Company's Compensation Committee is responsible for overseeing the management of risks relating to the Company's executive compensation plans and arrangements. The Company's Audit Committee oversees management of financial and cybersecurity risks. As part of this oversight, the Audit Committee receives periodic briefings, no less than annually, from senior management on information security matters, including data privacy and cyber-security. The Nominating and Corporate Governance Committee manages risks associated with the Company's corporate governance framework. Our Board is apprised of particular risk management matters in connection with its general oversight and approval of corporate matters and significant transactions. The Board does not believe that its role in the oversight of our risks affects the Board's leadership structure.

53. On April 29, 2025, the Company issued a press release announcing its first quarter results for 2025 (the "1Q25 Press Release"). The 1Q25 Press Release touted the Company's financial results and stated that the Company was "***confident***" in its ability to deliver growth. Specifically, the 1Q25 Press Release stated, in relevant part:

**First Quarter-over-Quarter Operating Highlights**

- Revenue was $1.4 billion for the first quarter, an increase of $49.5 million, or 3.6%.

- New vehicle revenue was $621.4 million for the first quarter, a decrease of $34.7 million, or 5.3%, and new vehicle unit sales were 16,726 units, a decrease of 156 units, or 0.9%. Used vehicle revenue was $422.4 million for the first quarter, an increase of $84.7 million, or 25.1%, and used vehicle unit sales were 13,939 units, an increase of 3,245 units, or 30.3%. Combined new and used vehicle unit sales were 30,665, an increase of 3,089 units, or 11.2%. . . .

- Gross profit was $429.6 million, an increase of $27.2 million, or 6.8%, and total gross margin was 30.4%, an increase of 89 basis points. The gross profit increase was mainly driven by the $19.2 million higher used vehicle gross profit from the increase in used vehicle unit sales and gross margin as discussed above and $13.2 million higher finance and insurance, net ("F&I") gross profit largely from the 11.2% increase in combined new and used vehicle unit sales and new F&I offerings. The gross margin improvements for used vehicles and products, service and other discussed above were partially offset by a 511 basis point decrease in Good Sam Services and Plans gross margin to 61.6%, which was

primarily a result of higher roadside assistance claim costs.

- Selling, general and administrative expenses ("SG&A") were $387.4 million, an increase of $16.0 million, or 4.3%. This increase was primarily driven by a $9.6 million increase in employee cash compensation costs, $7.3 million of additional advertising expenses, and a $2.0 million increase in employee stock-based compensation ("SBC") expense, partially offset by $4.2 million of reduced legal fees. SG&A Excluding SBC(2) was $380.3 million, an increase of $13.9 million, or 3.8%. . . .

| | **Three Months Ended March 31,** | | **Increase** | **Percent** |
|---|---|---|---|---|
| | **2025** | **2024** | **(decrease)** | **Change** |
| Unit sales | | | | |
| New vehicles | 16,726 | 16,882 | (156) | (0.9%) |
| Used vehicles | 13,939 | 10,694 | 3,245 | 30.3% |
| Total | 30,665 | 27,576 | 3,089 | 11.2% |
| | | | | |
| Average selling price | | | | |
| New vehicles | $ 37,154 | $ 38,863 | $ (1,709) | (4.4%) |
| Used vehicles | 30,300 | 31,577 | (1,277) | (4.0%) |
| | | | | |
| Same store unit sales(1) | | | | |
| New vehicles | 15,791 | 16,116 | (325) | (2.0%) |
| Used vehicles | 13,157 | 10,239 | 2,918 | 28.5% |
| Total | 28,948 | 26,355 | 2,593 | 9.8% |
| | | | | |
| Same store revenue(1) ($ in 000s) | | | | |
| New vehicles | $ 587,456 | $ 628,813 | $ (41,357) | (6.6%) |
| Used vehicles | 398,862 | 321,354 | 77,508 | 24.1% |
| Products, service and other | 139,506 | 149,776 | (10,270) | (6.9%) |
| Finance and insurance, net | 141,129 | 130,144 | 10,985 | 8.4% |
| Total | $ 1,266,953 | $ 1,230,087 | $ 36,866 | 3.0% |
| | | | | |
| Average gross profit per unit | | | | |
| New vehicles | $ 5,086 | $ 5,393 | $ (307) | (5.7%) |
| Used vehicles | 5,624 | 5,531 | 93 | 1.7% |
| Finance and insurance, net per vehicle unit | 4,848 | 4,912 | (64) | (1.3%) |
| Total vehicle front-end yield(2) | 10,179 | 10,359 | (180) | (1.7%) |

54. The 1Q25 Press Release also quoted Defendant Wagner who stated, in relevant part:

Our business continues to exhibit consistent growth in real time. ***We remain confident in our guideposts to deliver growth in excess of low-double digits in used units and low single digits in new units, vehicle gross margins within our historical range*** and SG&A as a percentage of gross profit improving by 600-700 basis points. We continue to meet the customer where they want to be met in terms of price and payment, leading to slightly lower than anticipated ASPs to start the year. We are rigorously managing our SG&A as we aim to mitigate any ASP or macroeconomic variability that could persist in the near-term.

55. On April 30, 2025, the Company hosted an earnings call with analysts and investors to discuss its first quarter results for 2025 (the "1Q25 Earnings Call"). During the 1Q25 Earnings Call, Defendant Lemonis emphasized Camping World's ability to execute on margin improvement through its SG&A plan, stating, in relevant part:

We entered the year with a few simple mandates: sell more RVs, ***improve our margins and reduce our costs. As part of that, we made a commitment to deliver for the 2025 year, an improvement of SG&A as a percentage of growth by 600 to 700 basis points***. . . .

We've taken decisive action on SG&A and craft preservation during the first quarter, the primary benefits of which we expect to show up in the second half of the year through the balance of the year so we may achieve our goal. . . .

[S]o we're particularly [ ] committed to pushing things through the system and growing market share in 2025. ***But we're doing it responsibly by proper inventory planning, proper stocking and a real collaboration around making sure that there's efficiency*** for both companies. I think as we look at the margin profile, it's clear that we didn't need to be overly promotional. Our new margins continue to be quite frankly in line with our historical levels, even though we know competitors have actually gotten far more aggressive. We haven't had to do that. . . .

It's the same thing we've said from day one. ***We have a very healthy balance sheet as Tom evidenced between cash, used inventory that we own free and clear***, parts that we own free and clear, real estate that we own free and clear and available revolvers both on the floor plan and in other areas.

56. During the 1Q25 Earnings Call, Defendants Wagner and Kirn further touted the Company's "laser focus[]" on balancing inventory supply and demand which would require "record levels of used inventory procurement," stating, in relevant part:

<u>Defendant Wagner</u>: Our momentum in new and used unit sales has extended far

beyond March with April to date used same-store unit sales up high teens and with new unit sales up high single digits. We again reached record levels of combined new and used unit market share, seeing it over 14% through February.

Importantly, we continue to maintain a high degree of velocity within our used RV supply chain, helping to fuel our significant used sales momentum. *We achieved record levels of used inventory procurement in March and we are on pace to set another record in April. This laser focused effort ensures we have an adequate supply of used inventory to sustain our comps into the peak selling season*. . . .

Defendant Kirn: For the first quarter, we recorded revenue of $1.4 billion, an increase of 4% driven primarily by a 30% increase in used unit sales. *Used vehicle gross margins of 18.6% continued to exhibit year-over-year improvement as we aggressively brought fresh inventory back into the system*.

57.    On May 1, 2025, the Company filed its Form 10-Q with the SEC reporting its first quarter results for 2025 (the "1Q25 10-Q"). The 1Q25 10-Q was signed by Defendant Kirn and included certifications signed by both Defendants Lemonis and Kirn wherein they certified that all information contained within the 1Q25 10-Q fairly represented the financial condition and results of operations of the Company pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 (the "SOX"). The 1Q25 10-Q disclosed that the Company had accelerated its procurement of used vehicles with the Company expecting used vehicle revenue to outpace its previous periods, stating, in relevant part:

We had experienced lower used vehicle inventory levels for much of 2024 as we slowed procurement to allow RV owner pricing expectations to adjust as a result of 2024 model year pricing declines. *Beginning in the fourth quarter of 2024, we took steps to reverse the trend of decreasing used vehicle revenue and unit sales, including the increase in the procurement of used vehicles, which resulted in a 25.1% increase in used vehicle revenue and 30.3% increase in used vehicle unit sales in the first quarter of 2025. Accordingly, we expect used vehicle revenue and unit sales to outpace comparative 2024 periods for much of 2025*. . . .

| | March 31, 2025 | December 31, 2024 | March 31, 2024 |
|---|---|---|---|
| **Assets** | | | |
| Current assets: | | | |
| Cash and cash equivalents | $ 20,916 | $ 208,422 | $ 29,718 |
| Contracts in transit | 149,113 | 61,222 | 154,231 |

| | | | |
|---|---:|---:|---:|
| Accounts receivable, net | 118,800 | 120,412 | 100,246 |
| Inventories | 2,119,169 | 1,821,837 | 2,077,592 |
| Prepaid expenses and other assets | 74,418 | 58,045 | 68,833 |
| Assets held for sale | 20,536 | 1,350 | 6,276 |
| Total current assets | 2,502,952 | 2,271,288 | 2,436,896 |
| | | | |
| Property and equipment, net | 886,244 | 846,760 | 878,956 |
| Operating lease assets | 749,177 | 739,352 | 768,903 |
| Deferred tax assets, net | 210,586 | 215,140 | 197,484 |
| Intangible assets, net | 18,520 | 19,469 | 12,998 |
| Goodwill | 747,802 | 734,023 | 735,680 |
| Other assets | 31,929 | 37,245 | 36,013 |
| Total assets | $ 5,147,210 | $ 4,863,277 | $ 5,066,930 |
| **Liabilities and stockholders' equity** | | | |
| Current liabilities: | | | |
| Accounts payable | $ 250,884 | $ 145,346 | $ 205,006 |
| Accrued liabilities | 160,711 | 118,557 | 148,674 |
| Deferred revenues | 89,084 | 92,124 | 95,854 |
| Current portion of operating lease liabilities | 65,653 | 61,993 | 60,663 |
| Current portion of finance lease liabilities | 7,646 | 7,044 | 19,014 |
| Current portion of Tax Receivable Agreement liability | 1,700 | — | 12,943 |
| Current portion of long-term debt | 23,147 | 23,275 | 25,651 |
| Notes payable – floor plan, net | 1,320,687 | 1,161,713 | 1,414,696 |
| Other current liabilities | 74,129 | 70,900 | 72,783 |
| Total current liabilities | 1,993,641 | 1,680,952 | 2,055,284 |

| | Three Months Ended March 31, | |
|---|---:|---:|
| | **2025** | **2024** |
| Revenue: | | |
| Good Sam Services and Plans | $ 46,208 | $ 45,681 |
| RV and Outdoor Retail | | |
| New vehicles | 621,432 | 656,086 |
| Used vehicles | 422,351 | 337,685 |
| Products, service and other | 164,992 | 177,894 |
| Finance and insurance, net | 148,667 | 135,454 |
| Good Sam Club | 9,874 | 11,217 |
| Subtotal | 1,367,316 | 1,318,336 |
| Total revenue | 1,413,524 | 1,364,017 |
| Costs applicable to revenue (exclusive of depreciation and amortization shown separately below): | | |
| Good Sam Services and Plans | 17,721 | 15,183 |
| RV and Outdoor Retail | | |
| New vehicles | 536,359 | 565,039 |
| Used vehicles | 343,961 | 278,533 |

22

| | | |
|---|---:|---:|
| Products, service and other | 84,739 | 101,675 |
| Good Sam Club | 1,116 | 1,190 |
| Subtotal | 966,175 | 946,437 |
| Total costs applicable to revenue | 983,896 | 961,620 |
| Operating expenses: | | |
| Selling, general, and administrative | 387,445 | 371,473 |
| Depreciation and amortization | 22,544 | 19,290 |
| Long-lived asset impairment | 620 | 5,827 |
| (Gain) loss on sale or disposal of assets | (1,823) | 1,585 |
| Total operating expenses | 408,786 | 398,175 |
| Income from operations | 20,842 | 4,222 |
| Other expense: | | |
| Floor plan interest expense | (18,306) | (27,882) |
| Other interest expense, net | (30,531) | (36,094) |
| Other expense, net | (158) | (94) |
| Total other expense | (48,995) | (64,070) |
| Loss before income taxes | (28,153) | (59,848) |
| Income tax benefit | 3,471 | 9,042 |
| Net loss | (24,682) | (50,806) |
| Less: net loss attributable to non-controlling interests | 12,402 | 28,499 |
| Net loss attributable to Camping World Holdings, Inc. | $ (12,280) | $ (22,307) |

58. On July 29, 2025, the Company issued a press release announcing its second quarter results for 2025 (the "2Q25 Press Release"). The 2Q25 Press Release touted the Company's "margin performance" and flexibility, with Defendants Lemonis and Wagner quoted as stating, in relevant part:

> Defendant Lemonis: I am unbelievably pleased with our Company's financial performance in the quarter, driven by volume, margin performance and aggressive cost controls. *We continue to surgically manage our inventory to find volume and gross profit opportunities leveraging our new and used supply chains, our contract manufacturing relationships, our sophisticated data analytics, and the strength of our balance sheet to put the right inventory on the ground at the right time and the right price. Our nimbleness is a true testament to the differentiation and durability of our model*. . . .
>
> We have made structural changes to our fixed costs compared to last year, reducing our headcount by over 900, consolidating 16 locations, and selling 7,818 more units; meaningfully improving our per-rooftop productivity and *proving we can adapt to the near-term ASP contribution margin environment in new vehicles. We have made structural changes to our fixed costs compared to last year, reducing our headcount by over 900, consolidating 16 locations, and selling 7,818 more units; meaningfully improving our per-rooftop productivity and*

23

*proving we can adapt to the near-term ASP contribution margin environment in new vehicles.*

Defendant Wagner: Our same store unit growth trends July month-to-date are tracking up high-teens percent on used vehicles and up high-singles on new vehicles compared to the prior year, both in line on a multi-year basis with our second quarter performance. ***Our guideposts for the full year remain largely unchanged, although our new unit volume is now expected to be higher, growing in excess of high-singles compared to the prior year. New vehicle ASP is expected to improve seasonally in the third and fourth quarter but could be lower by 10-12% for the full year compared to the prior year. Despite this drop in ASP we are expecting to accomplish 300-400 basis points of improvement in SG&A as a percentage of gross profit, recognizing that this efficiency will improve further as ASPs rebound.***

59.     The 2Q25 Press Release also reported the Company's revenue and profits, stating,

in relevant part:

**Second Quarter-over-Quarter Operating Highlights**
- Revenue was $2.0 billion for the second quarter, an increase of $169.4 million, or 9.4%.
- New vehicle revenue was $915.1 million for the second quarter, an increase of $68.0 million, or 8.0%, and new vehicle unit sales were 26,696 units, an increase of 4,612 units, or 20.9%. Used vehicle revenue was $572.3 million for the second quarter, an increase of $91.5 million, or 19.0%, and used vehicle unit sales were 18,906 units, an increase of 3,206 units, or 20.4%. Combined new and used vehicle unit sales were 45,602, an increase of 7,818 units, or 20.7%. . . .
- Gross profit was $592.3 million, an increase of $44.6 million, or 8.1%, and total gross margin was 30.0%, a decrease of 34 basis points. The gross profit increase was mainly driven by the $25.9 million higher used vehicle gross profit from the increase in used vehicle unit sales and gross margin as discussed above and $22.2 million increased finance and insurance, net ("F&I") gross profit largely from the 20.7% increase in combined new and used vehicle unit sales and new F&I offerings. The gross margin decrease was primarily from higher roadside assistance claim costs that drove the 777 basis point decrease in Good Sam Services and Plans gross margin to 59.5%, which was mostly offset by improvements for used vehicles and products, service and other discussed above.
- Selling, general and administrative expenses ("SG&A") were $437.5 million, an increase of $17.8 million, or 4.2%. This increase was primarily driven by a $7.5 million increase in employee cash compensation costs, a $3.0 million increase in employee stock-based compensation ("SBC") expense, $2.9 million of additional advertising expenses, and an additional $3.3 million for other outside service providers. SG&A Excluding SBC(3) was $429.1 million, an

increase of $14.8 million, or 3.6%. . . .

| | | Three Months Ended June 30, | | Increase | Percent |
|---|---|---|---|---|---|
| | | 2025 | 2024 | (decrease) | Change |
| Unit sales | | | | | |
| New vehicles | | 26,696 | 22,084 | 4,612 | 20.9% |
| Used vehicles | | 18,906 | 15,700 | 3,206 | 20.4% |
| Total | | 45,602 | 37,784 | 7,818 | 20.7% |
| | | | | | |
| Average selling price | | | | | |
| New vehicles | $ | 34,279 | $ 38,358 | $ (4,079) | (10.6%) |
| Used vehicles | | 30,269 | 30,623 | (354) | (1.2%) |
| | | | | | |
| Same store unit sales(1) | | | | | |
| New vehicles | | 24,360 | 19,936 | 4,424 | 22.2% |
| Used vehicles | | 17,528 | 14,509 | 3,019 | 20.8% |
| Total | | 41,888 | 34,445 | 7,443 | 21.6% |
| | | | | | |
| Same store revenue(1) ($ in 000s) | | | | | |
| New vehicles | $ | 833,171 | $ 768,687 | $ 64,484 | 8.4% |
| Used vehicles | | 525,573 | 448,019 | 77,554 | 17.3% |
| Products, service and other | | 179,017 | 186,445 | (7,428) | (4.0%) |
| Finance and insurance, net | | 186,659 | 163,615 | 23,044 | 14.1% |
| Total | $ | 1,724,420 | $ 1,566,766 | $ 157,654 | 10.1% |
| | | | | | |
| Average gross profit per unit | | | | | |
| New vehicles | $ | 4,729 | $ 5,862 | $ (1,133) | (19.3%) |
| Used vehicles | | 6,190 | 5,807 | 383 | 6.6% |
| Finance and insurance, net per vehicle unit | | 4,412 | 4,738 | (326) | (6.9%) |
| Total vehicle front-end yield(2) | | 9,747 | 10,577 | (830) | (7.8%) |
| | | | | | |
| Gross margin | | | | | |
| Good Sam Services and Plans | | 59.5% | 67.3% | (777) bps | |
| New vehicles | | 13.8% | 15.3% | (149) bps | |
| Used vehicles | | 20.5% | 19.0% | 149 bps | |
| Products, service and other | | 47.8% | 43.7% | 411 bps | |
| Finance and insurance, net | | 100.0% | 100.0% | unch | |
| Good Sam Club | | 88.1% | 86.8% | 133 bps | |
| Subtotal RV and Outdoor Retail | | 29.1% | 29.2% | (7) bps | |
| Total gross margin | | 30.0% | 30.3% | (34) bps | |

60.     On July 30, 2025, the Company hosted an earnings call for analysts and investors

25

to discuss its second quarter results for 2025 (the "2Q25 Earnings Call"). During the 2Q25 Earnings Call, Defendant Lemonis touted the Company's ability to quickly put the "right kind of inventory" on the ground for both new and used vehicles, stating, in relevant part:

> ***I'm also happy that with the pressure that we've seen in the general macro environment, our nimbleness and our knowledge of inventory and our ability to act quickly has put the right kind of inventory on the ground on both the new side and the used side.*** Customers walk in our front door. We don't try to drive them to 1 specific unit. We try to drive them to a transaction and folks different levels of affordability and different preferences around floor plan and our sales process leads them to a transaction that ends up closing.
>
> I'm also happy to report that our gross margins broke [Technical Difficulty]. So, any idea that we grew our volume on the backs of heavy discounting, that would be false. Earlier in the year, I think probably in January or February, we set a short-term goal of reducing our SG&A by 600 to 700 basis points. Let me be crystal clear. That goal isn't moving. We made a lot of progress in the quarter despite the ASP pressure that the general market gave us. . . .
>
> As we look forward to our capital allocation, and you can see the $118 million of cash on our balance sheet, ***the amount of inventory we own free and clear,*** the amount of real estate that we own without a mortgage; ***our balance sheet, quite frankly, has never been stronger.*** So far for the year, we've de-levered a pretty significant amount, and Tom will address that in his results -- in his comments a little later.

61.     Defendant Wagner echoed Defendant Lemonis' statements during the 2Q25 Earnings Call, stating, in relevant part:

> [L]et's not forget the competitive advantage that we have with our contract manufacturing and our ability to just add additional content features while we even just like had done previous cursory checks of competitors. I mean, we are clearly coming in under invoice pricing based upon OEM brands that are of equivalent products. So, I don't know that I'm seeing any different type of behavior than we normally would experience. ***I mean, just as well, we feel like we've played a much more competitive and intelligent game in terms of our inventory management.***

62.     On the same day, the Company filed its Form 10-Q with the SEC reporting its second quarter results for 2025 (the "2Q25 10-Q"). The 2Q25 10-Q was signed by Defendant Kirn and included certifications signed by both Defendants Lemonis and Kirn wherein they certified

26

that all information contained within the 2Q25 10-Q fairly represented the financial condition and results of operations of the Company pursuant to Section 906 of SOX. The 2Q25 10-Q reported that the Company's accelerated procurement of used vehicles, which purportedly resulted in an increase in used vehicle revenue, would outpace comparative 2024 periods, stating, in relevant part:

> We had experienced lower used vehicle inventory levels for much of 2024 as we slowed procurement to allow RV owner pricing expectations to adjust as a result of 2024 model year pricing declines. ***Beginning in the fourth quarter of 2024, we took steps to reverse the trend of decreasing used vehicle revenue and unit sales, including the increase in the procurement of used vehicles, which resulted in a 21.5% increase in used vehicles revenue and 24.4% increase in used vehicles unit sales in the first half of 2025. Accordingly, we expect used vehicle revenue and unit sales to outpace comparative 2024 periods for much of 2025***.

| | June 30, 2025 | December 31, 2024 | June 30, 2024 |
|---|---|---|---|
| **Assets** | | | |
| Current assets: | | | |
| Cash and cash equivalents | $ 118,084 | $ 208,422 | $ 23,743 |
| Contracts in transit | 163,767 | 61,222 | 165,033 |
| Accounts receivable, net | 137,822 | 120,412 | 128,938 |
| Inventories | 2,061,160 | 1,821,837 | 2,014,444 |
| Prepaid expenses and other assets | 57,974 | 58,045 | 68,220 |
| Assets held for sale | 15,202 | 1,350 | 8,418 |
| Total current assets | 2,554,009 | 2,271,288 | 2,408,796 |
| | | | |
| Property and equipment, net | 910,052 | 846,760 | 856,308 |
| Operating lease assets | 716,020 | 739,352 | 760,143 |
| Deferred tax assets, net | 211,435 | 215,140 | 193,873 |
| Intangible assets, net | 17,602 | 19,469 | 21,354 |
| Goodwill | 748,561 | 734,023 | 731,015 |
| Other assets | 34,168 | 37,245 | 34,387 |
| Total assets | $5,191,847 | $ 4,863,277 | $5,005,876 |
| **Liabilities and stockholders' equity** | | | |
| Current liabilities: | | | |
| Accounts payable | $ 283,450 | $ 145,346 | $ 260,390 |
| Accrued liabilities | 182,581 | 118,557 | 187,120 |
| Deferred revenues | 94,041 | 92,124 | 99,045 |
| Current portion of operating lease liabilities | 65,488 | 61,993 | 62,795 |

| | | | |
|---|---|---|---|
| Current portion of finance lease liabilities | 19,514 | 7,044 | 7,335 |
| Current portion of Tax Receivable Agreement liability | 1,700 | — | 12,277 |
| Current portion of long-term debt | 23,023 | 23,275 | 24,082 |
| Notes payable – floor plan, net | 1,280,102 | 1,161,713 | 1,296,352 |
| Other current liabilities | 79,167 | 70,900 | 80,343 |
| Total current liabilities | 2,029,066 | 1,680,952 | 2,029,739 |

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2025 | 2024 | 2025 | 2024 |
| Revenue: | | | | |
| Good Sam Services and Plans | $ 54,213 | $ 52,548 | $ 100,421 | $ 98,229 |
| RV and Outdoor Retail | | | | |
| New vehicles | 915,106 | 847,105 | 1,536,538 | 1,503,191 |
| Used vehicles | 572,271 | 480,774 | 994,622 | 818,459 |
| Products, service and other | 222,890 | 235,947 | 387,882 | 413,841 |
| Finance and insurance, net | 201,198 | 179,016 | 349,865 | 314,470 |
| Good Sam Club | 10,270 | 11,115 | 20,144 | 22,332 |
| Subtotal | 1,921,735 | 1,753,957 | 3,289,051 | 3,072,293 |
| Total revenue | 1,975,948 | 1,806,505 | 3,389,472 | 3,170,522 |
| Costs applicable to revenue (exclusive of depreciation and amortization shown separately below): | | | | |
| Good Sam Services and Plans | 21,947 | 17,192 | 39,668 | 32,375 |
| RV and Outdoor Retail | | | | |
| New vehicles | 788,873 | 717,650 | 1,325,232 | 1,282,689 |
| Used vehicles | 455,239 | 389,601 | 799,200 | 668,134 |
| Products, service and other | 116,412 | 132,933 | 201,151 | 234,608 |
| Good Sam Club | 1,222 | 1,470 | 2,338 | 2,660 |
| Subtotal | 1,361,746 | 1,241,654 | 2,327,921 | 2,188,091 |
| Total costs applicable to revenue | 1,383,693 | 1,258,846 | 2,367,589 | 2,220,466 |
| Operating expenses: | | | | |
| Selling, general, and administrative | 437,489 | 419,676 | 824,934 | 791,149 |
| Depreciation and amortization | 23,419 | 20,032 | 45,963 | 39,322 |
| Long-lived asset impairment | — | 4,584 | 620 | 10,411 |
| Lease termination | (107) | 40 | (107) | 40 |
| Loss (gain) on sale or disposal of assets | 1,185 | 7,945 | (638) | 9,530 |
| Total operating expenses | 461,986 | 452,277 | 870,772 | 850,452 |
| Income from operations | 130,269 | 95,382 | 151,111 | 99,604 |
| Other expense: | | | | |
| Floor plan interest expense | (20,989) | (27,799) | (39,295) | (55,681) |
| Other interest expense, net | (30,836) | (36,153) | (61,367) | (72,247) |
| Other expense, net | (2,600) | (81) | (2,758) | (175) |
| Total other expense | (54,425) | (64,033) | (103,420) | (128,103) |

| | | | | |
|---|---|---|---|---|
| Income (loss) before income taxes | 75,844 | 31,349 | 47,691 | (28,499) |
| Income tax (expense) benefit | (18,321) | (7,935) | (14,850) | 1,107 |
| Net income (loss) | 57,523 | 23,414 | 32,841 | (27,392) |
| Less: net income (loss) attributable to non-controlling interests | (27,307) | (13,643) | (14,905) | 14,856 |
| Net income (loss) attributable to Camping World Holdings, Inc. | $ 30,216 | $ 9,771 | $ 17,936 | $ (12,536) |

63. The above statements in ¶¶ 52-62 were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the Individual Defendants failed to disclose to investors, *inter alia*, that: (i) the Company had overstated its ability to adeptly manage its inventory to optimize profitability; (ii) the Company needed to undertake corrective measures on its inventory management systems and processes; (iii) the Company's inadequate systems and processes prevented it from ensuring reasonably accurate disclosures and/or guidance, including, but not limited to, its ability to manage SG&A expenses and maintain a healthy balance sheet; (iv) consumer retail demand was lower than the Company experienced and/or reasonably expected; (v) the Company failed to maintain adequate internal controls and risk oversight mechanisms; and (vi) as a result of the foregoing, the Company's public statements regarding its business, operations, and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

***The Truth Begins to Emerge***

64. The truth began to emerge on October 28, 2025, when the Company issued a press release discussing its results for the third quarter of 2025 (the "3Q25 Press Release"). The 3Q25 Press Release reported, among other things, that "new vehicle revenue was $766.8 million for the third quarter, *a decrease of $58.1 million, or 7.0%*," that the "average selling price of new vehicles sold *decreased 8.6%*," and that "new vehicle gross margin was 12.7%, *a decrease of 81 basis points, driven primarily by the 8.6% decrease in the average selling price per new vehicle sold*."

Specifically, the 3Q25 Press Release stated, in relevant part:

> **Third Quarter-over-Quarter Operating Highlights**
> - Revenue was $1.8 billion for the third quarter, an increase of $81.1 million, or 4.7%.
> - New vehicle revenue was $766.8 million for the third quarter, a decrease of $58.1 million, or 7.0%, and new vehicle unit sales were 20,286 units, an increase of 343 units, or 1.7%. Used vehicle revenue was $589.1 million for the third quarter, an increase of $141.9 million, or 31.7%, and used vehicle unit sales were 18,694 units, an increase of 4,629 units, or 32.9%. Combined new and used vehicle unit sales were 38,980, an increase of 4,972 units, or 14.6%. . . .
> - New vehicle gross margin was 12.7%, a decrease of 81 basis points, driven primarily by the 8.6% decrease in the average selling price per new vehicle sold, partially offset by a 7.8% reduction in the average cost per new vehicle sold. Used vehicle gross margin was 18.3%, an increase of 16 basis points, primarily due to a 1.1% decrease in the average cost per unit sold, partially offset by the 0.9% lower average selling price. . . .
> - Gross profit was $517.0 million, an increase of $18.5 million, or 3.7%, and total gross margin was 28.6%, a slight decrease of 27 basis points. The gross profit increase was mainly driven by the $26.7 million higher used vehicle gross profit from the increase in used vehicle unit sales as discussed above and $12.0 million increased finance and insurance, net ("F&I") gross profit largely from the 14.6% increase in combined new and used vehIcle unit sales and new F&I offerings. The slight gross margin decrease was primarily from the reduced average selling price per new vehicle sold, which was mostly offset by higher finance and insurance, net revenue that contributes 100.0% gross margin.

65.    The 3Q25 Press Release also quoted Defendant Lemonis who stated, in relevant part:

> As our team prepares for 2026, we are extremely confident in our ability to once again outperform the RV industry, grow our earnings, and continue to reduce our leverage year-over-year. As expected, affordability is still top of mind for consumers, and rising prices could create resistance on demand. This is leading us to deliberately set conservative new volume growth assumptions. Our Company will continue to rely on our market leading used, service, and Good Sam businesses as our financial performance differentiator. ***While it is early in our forecasting, we see a consecutive year of Adjusted EBITDA growth, starting in the low $300 million range,*** and a plan to outperform it. . . .
>
> Our management team believes this ***judicious conservatism, combined with our fortified balance sheet and improving leverage, has set the stage for our return to measured and accretive M&A activity across the business.***

66.     On October 29, 2025, before market open, the Company hosted an earnings call with analysts and investors to discuss its third quarter results for 2025 (the "3Q25 Earnings Call"). During the 3Q25 Earnings Call, Defendant Lemonis revealed that the Company needed to liquidate more inventory while reassuring investors that the Company had overcome the bulk of its inventory issues stating, in relevant part:

> It's a little early in the quarter for us to predict where things are going to land. As Matt mentioned earlier, we have seen resistance on the new side. Nothing that alarms us, but it is a resistance where we're starting to comp year-over-year-over-year growth. On the used side, we're continuing to see performance there. *I have sort of laid down the gauntlet with the team on wanting to make sure that we're going into 2026 with, again, clean inventory, no excuses in 2026. So I've been a little bit more aggressive in pushing them to liquidate out of inventory, and that's probably a little dangerous of a word, liquidate, sell-through a little inventory just to make sure we go in a little cleaner*. . . .

> [T]he one thing that I think Matt and the team have done very well in acknowledging the potential resistance on the new side is, *if you look at the stocking of used, we've become far better at that side of the supply chain*. And part of the really intentional conservatism for '26 is that we really start to build out our cash flow and our inventory positions. And when we think about placing orders 3, 6, 9 months in advance on the new side, it was more judicious for us to build that model with a lower expectation, knowing that if we wanted to take on more new at any time, if we were wrong about our calculus, that would be easy to get inventory. But I think what I really appreciate about our strategy is, if we are right about our strategy, if the new is going to have a little bit of resistance, we're not going to be kicking the can on new aging into the next 12 to 24 months. *And when we look back on what happened over history, we may have gone into the years with just because we were outperforming everybody else, a little bit of a delusion about what was happening, and we would go for it on the inventory side and then find out 18 months later that we have to discount our way out of stuff. So what you're hearing from us today is just a more tempered approach to stocking and to forecasting and that we know that if we outperform like we always do, it's easy for us to get more inventory*. It's really hard to get rid of inventory that we miscalculated.

67.     On this news, the Company's stock price fell $4.17, or 24.8%, from a closing price of $16.82 on October 28, 2025, to a closing price of $12.65 on October 29, 2025, on unusually heavy trading volume.

68. The above statements in ¶¶ 64-66 were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the Individual Defendants failed to disclose to investors, *inter alia*, that: (i) the Company had overstated its ability to adeptly manage its inventory to optimize profitability; (ii) the Company needed to undertake further corrective measures on its inventory management systems and processes; (iii) the Company's inadequate systems and processes prevented it from ensuring reasonably accurate disclosures and/or guidance, including, but not limited to, its ability to manage SG&A expenses and maintain a healthy balance sheet; and (iv) as a result of the foregoing, the Company's public statements regarding its business, operations, and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

### *The Truth Fully Emerges*

69. The truth fully emerged on February 24, 2026, when the Company issued the 4Q25 Press Release reporting, among other things, that the Company had "implemented strict, corrective inventory management objectives to structurally improve [its] turnover rates," which created gross margin headwinds into 2026. In the 4Q25 Press Release, the Company reported, in relevant part:

> **Fourth Quarter-over-Quarter Operating Highlights**
> - Revenue was $1.2 billion for the fourth quarter, a decrease of $30.9 million, or 2.6%.
> - New vehicle revenue was $457.8 million for the fourth quarter, a decrease of $39.7 million, or 8.0%, and new vehicle unit sales were 10,750 units, a decrease of 825 units, or 7.1%. Used vehicle revenue was $386.5 million for the fourth quarter, an increase of $38.4 million, or 11.0%, and used vehicle unit sales were 12,035 units, an increase of 1,462 units, or 13.8%. Combined new and used vehicle unit sales were 22,785, an increase of 637 units, or 2.9%.
> - Average selling price of new vehicles sold decreased 0.9% and average selling price of used vehicles sold decreased 2.5%.
> - Same store new vehicle unit sales decreased 5.3% for the fourth quarter and same store used vehicle unit sales increased 14.7%. Combined same store new and used vehicle unit sales increased 4.3%.
> - New vehicle gross margin was 12.3%, a decrease of 291 basis points, driven primarily by the 2.5% increase in the average cost per new vehicle sold and the

0.9% decrease in the average selling price per new vehicle sold. Used vehicle gross margin was 16.0%, a decrease of 277 basis points, primarily due to the 2.5% lower average selling price and the 0.9% increase in the average cost per used vehicle sold, driven in part by accelerated sales of aged used vehicles in December. . . .

- Gross profit was $338.2 million, a decrease of $38.7 million, or 10.3%, and total gross margin was 28.8%, a decrease of 247 basis points. The gross profit decrease was mainly driven by the $19.3 million lower new vehicle gross profit, $7.6 million of decreased finance and insurance, net ("F&I") gross profit, $4.1 million of decreased products, service and other gross profit, and $3.5 million of decreased used vehicles gross profit. . . .

- Net loss was $(109.1) million for the fourth quarter of 2025, an increased loss of $49.6 million, or 83.3%. Adjusted EBITDA was $(26.2) million, an increased loss of $23.7 million. . . .

| | Three Months Ended December 31, | | Year Ended December 31, | |
|---|---|---|---|---|
| ($ in thousands) | 2025 | 2024 | 2025 | 2024 |
| **SG&A Excluding SBC:** | | | | |
| SG&A | $ 367,277 | $ 367,759 | $ 1,603,222 | $ 1,573,117 |
| SBC - SG&A | (20,698) | (5,322) | (43,819) | (21,213) |
| SG&A Excluding SBC | $ 346,579 | $ 362,437 | $ 1,559,403 | $ 1,551,904 |
| As a percentage of gross profit | 102.5% | 96.2% | 83.1% | 85.0% |

70.     The 4Q25 Press Release also quoted Defendant Wagner who disclosed that the Company would need to implement strict and corrective measures to improve the Company's inventory turnover rates stating, in relevant part:

Early season RV show momentum underscores our confidence in our ability to outpace broader RV unit industry trends and meaningfully grow our Adjusted EBITDA in 2026. To best position our organization for sustained, multi-year growth, *we have implemented strict, corrective inventory management objectives to structurally improve our turnover rates. These actions are expected to result in gross margin headwinds in the first half of 2026*, before providing tailwinds in the second half of the year and beyond.

71.     Moreover, the 4Q25 Press Release announced that the Company would be pausing its quarterly cash dividend effective immediately given the "consideration of forecasted tax distributions, the reduced availability of excess tax distributions to fund dividend payments driven

partly by the impact of recent tax law changes, and in consideration of the Company's focus on reducing net debt leverage."

72. On February 25, 2026, before market open, the Company hosted an earnings call for analysts and investors to discuss its fourth quarter and full year results for 2025 (the "4Q25 Earnings Call"). During the 4Q25 Earnings Call, Defendants Wagner and Kirn identified the issues the Company faced stating, in relevant part:

> Defendant Wagner: By improving our inventory turnover rate, we will increase working capital efficiency with fresher inventory. To put it even more simply, we will do more with less and position ourselves to generate higher revenue and greater earnings power with less inventory. *This will require a strict and at times, aggressive approach to move through certain aged and noncore RV assets. While this strategy is essential to reset our foundation and enhance future cash flows, we expect it will create a near-term negative impact on our gross profit per unit for both new and used vehicles.* This proactive strategy is a key driver behind our outlook for the year. During our Q3 call, we set a minimum expectation of $310 million in adjusted earnings for 2026. *Given our decision to accelerate the cleansing of our inventory, we believe this strategy could negatively impact EBITDA by about $35 million in 2026, particularly in the front half of the year*. . . .

> Defendant Kirn: As we think about the drivers of the delta in our fourth quarter results versus our own expectations, *the largest was the December hit to vehicle margins as we accelerated the cleansing of our inventory,* along with dealer insurance product cancellation reserves. Our 2026 guidance calls for adjusted EBITDA in the range of $275 million to $325 million, with just over 50% of the annual adjusted EBITDA expected to occur in the first half of the year.

73. On this news, the Company's stock price fell $1.79, or 16.5%, from a closing price of $10.85 per share on February 24, 2026, to a closing price of $9.06 per share on February 25, 2026, on heavy trade volume.

**Harm to the Company**

74. As a direct and proximate result of the Individual Defendants' misconduct, Camping World has lost and expended, and will lose and expend, millions of dollars.

34

75. Such expenditures include, but are not limited to, the legal fees associated with the Securities Class Action filed against the Company and Defendants Lemonis, Wagner, and Kirn, and amounts paid to outside lawyers, accountants, and investigators in connection therewith.

76. Such expenditures also include, but are not limited to, significant compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

77. Furthermore, the Securities Class Action has exposed the Company to massive class-wide liability.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

78. Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties by the Individual Defendants.

79. Plaintiff will adequately and fairly represent the interests of Camping World and its shareholders in enforcing and prosecuting its rights.

80. Camping World is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

81. Plaintiff is a current shareholder of Camping World and was a continuous shareholder of the Company during the period of the Individual Defendants' wrongdoing alleged herein. Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

82. A pre-suit demand on the Board of Camping World is futile and, therefore, excused. At the time this action was commenced, the eight-person Board consisted of Individual Defendants Moody, Baltins, Cassidy, George, Malone, Schickli, Lane, and Wagner (the "Director Defendants"). Accordingly, Plaintiff is only required to show that four Director Defendants cannot

exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action. As set forth below, all of the Director Defendants are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action because they face a substantial likelihood of liability for the misconduct alleged herein. Therefore, demand on the Board to institute this action is not necessary because such a demand would have been a futile and useless act.

83.     The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

84.     Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

85.     Each of the Director Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

86.     As members of the Board charged with overseeing the Company's affairs, each of the Director Defendants had knowledge, or the fiduciary obligation to inform themselves, of information pertaining to the Company's core operations and the material events giving rise to these claims.  Specifically, as Board members of Camping World, the Director Defendants knew, or should have known, the material facts surrounding Camping World's financial condition and

internal control mechanisms.

87. Defendant Wagner is not disinterested or independent. In addition to serving as a director, Defendant Wagner also serves as the Company's President and CEO. Thus, as conceded in the 2026 Proxy, Defendant Wagner is a non-independent director. Furthermore, Defendant Wagner is named as a defendant, and therefore faces significant personal liability, in the Securities Class Action based on substantially the same wrongdoing as alleged herein, specifically issuing materially false and misleading statements during the Relevant Period. Accordingly, demand upon Wagner is futile, and thus excused.

88. Additionally, each of the Director Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

89. Moreover, the Director Defendants willfully ignored, or recklessly failed to inform themselves of, the obvious problems with the Company's internal controls, practices, and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence. As a result of the foregoing, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

90. Defendants Malone, Schickli, and Lane (the "Audit Defendants") served on the Company's Audit Committee during the Relevant Period, and pursuant to the Audit Committee Charter, were specifically charged with the responsibility to assist the Board in fulfilling its oversight responsibilities related to, *inter alia*, financial reporting and the underlying internal controls and procedures over financial reporting. At all relevant times, however, the Audit Defendants breached their fiduciary duty to the Company by failing to prevent, correct, or inform

the Board of the issuance of material misstatements and omissions regarding the Company's business, finances, and operations, as alleged above. Therefore, the Audit Defendants cannot independently consider any demand to sue themselves for breaching their fiduciary duties to the Company, as that would expose them to substantial liability and threaten their livelihoods.

91. The Director Defendants, as members of the Board, were and are subject to the Company's Code of Conduct. The Code of Conduct goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations, requiring the Director Defendants to also adhere to the Company's standards of business conduct. The Director Defendants violated the Code of Conduct because they knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. Because the Director Defendants violated the Code of Conduct, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

92. All of the Board's current members derive substantial revenue from the Company, control the Company, and are indebted to each other. These conflicts of interest have precluded the Board's current members from calling into question the Director Defendants' conduct.

93. Moreover, none of the Director Defendants have taken remedial action to redress the conduct alleged herein.

94. The Director Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgement as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter. As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein. They cannot be presumed to be capable of exercising independent and disinterested

judgement about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

95.     The acts complained of herein constitute violations of fiduciary duties owed by Camping World's officers and directors, and these acts are incapable of ratification.

96.     Thus, for all the reasons set forth above, the Director Defendants are unable to consider a demand with the requisite disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## COUNT I
**Against the Individual Defendants for Violations of § 14(a)**
**of the Exchange Act, 15 U.S.C. § 78n(a) and Rule 14a-9 (17 C.F.R. § 240.14a-9)**

97.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

98.     The Individual Defendants violated Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), and Rule 14a-9, 17 C.F.R. § 240.14a-9, promulgated thereunder by the SEC.

99.     Section 14(a) of the Exchange Act provides that:

> It shall be unlawful for any person, by use of the mails or by means of instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 781].

15 U.S.C. § 78n(a).

100.     Rule 14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false

or misleading[.]" 17 C.F.R. § 240.14a-9.

101. The Individual Defendants, individually and in concert, disseminated and/or permitted the dissemination of materially false and misleading statements in the 2025 Proxy, which was filed with the SEC. As alleged above, the 2025 Proxy was materially false and misleading because it failed to disclose, *inter alia*, that the Board and management were not properly overseeing risks to the Company, namely risks related to its inventory systems and processes.

102. The misrepresentations and omissions in the 2025 Proxy were material to Company stockholders. Specifically, the misrepresentations and omissions were material to Company stockholders in voting on matters set forth for shareholder determination in the 2025 Proxy, including, but not limited to, the reelection of certain of the Individual Defendants to the Board. Specifically, the materially false and misleading statements contained in the 2025 Proxy misleadingly induced shareholders to vote for the reelection of Individual Defendants Cassidy, Lemonis, and Malone to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company.

103. As a result of the Individual Defendants' material misrepresentations and omissions in the 2025 Proxy, the Company has sustained significant damages.

104. Plaintiff, on behalf of Camping World, has no adequate remedy at law.

## COUNT II
### Against the Individual Defendants
### For Breach of Fiduciary Duty

105. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

106. The Individual Defendants owed the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

107. Each of the Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, good faith, loyalty, oversight, and supervision.

108. The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by permitting the use of inadequate practices and procedures to guide the truthful dissemination of Company news to the investing public and to the Company's shareholders, allowing or permitting false and misleading statements to be disseminated in the Company's SEC filings and other disclosures, and otherwise failing to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

109. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (i) the Company had overstated its ability to adeptly manage its inventory to optimize profitability; (ii) the Company needed to undertake corrective measures on its inventory management systems and processes; (iii) the Company's inadequate systems and processes prevented it from ensuring reasonably accurate disclosures and/or guidance, including, but not limited to, its ability to manage SG&A expenses and maintain a healthy balance sheet; (iv) consumer retail demand was lower than the Company experienced and/or reasonably expected; (v) the Company failed to maintain adequate internal controls and risk oversight mechanisms; and (vi)

as a result of the foregoing, the Company's public statements regarding its business, operations, and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

110. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

111. In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and omissions of material fact referenced herein.

112. As a direct and proximate result of the Individual Defendants' failure to fulfill their fiduciary obligations, the Company has sustained significant damages.

113. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs incurred in defending itself in the Securities Class Action, exposing the Company to millions of dollars in potential class-wide damages in the Securities Class Action, and damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

114. Plaintiff, on behalf of Camping World, has no adequate remedy at law.

## COUNT III
### Against the Individual Defendants for Aiding and Abetting Breach of Fiduciary Duty

115. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

116. By encouraging and accomplishing the illegal and improper transactions alleged herein and concealing them from the public, the Individual Defendants have each encouraged, facilitated, and advanced their breaches of their fiduciary duties. In so doing, the Individual Defendants have each aided and abetted, conspired, and schemed with one another to breach their fiduciary duties, waste the Company's corporate assets, and engage in the ultra vires and illegal conduct complained of herein.

117. Plaintiff on behalf of Camping World has no adequate remedy at law.

## COUNT IV
### Against the Individual Defendants for Unjust Enrichment

118. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

119. By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Camping World.

120. The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Camping World that was tied to the performance or artificially inflated valuation of Camping World, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

121. Plaintiff, as a shareholder and a representative of Camping World, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits

and other compensation procured by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

122. Plaintiff on behalf of Camping World has no adequate remedy at law.

## COUNT V
### Against the Individual Defendants for Waste of Corporate Assets

123. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

124. The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the time period in issue. It resulted in continuous, connected, and ongoing harm to the Company.

125. As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (i) paying and colleting excessive compensation and bonuses; and (ii) incurring potentially millions of dollars of legal liability and/or legal costs, including defending against the Securities Class Action.

126. As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

127. Plaintiff, on behalf Camping World, has no adequate remedy at law.

## COUNT VI
### Against Individual Defendants Lemonis, Wagner, and Kirn for
### Contribution Under Section 10(b) and 21D of the Exchange Act

128. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

129. The Company and Individual Defendants Lemonis, Wagner, and Kirn are named as defendants in the Securities Class Action, which asserts claims under federal securities laws for violations of Section 10(b) and 20(a) of the Exchange Act, and Rule 10b-5 promulgated thereunder

44

by the SEC. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole, or in part, due to the Individual Defendants Lemonis', Wagner's, and/or Kirn's willful and/or reckless violations of their obligations as officers and/or directors of the Company.

130.    Defendants Lemonis, Wagner, and Kirn, because of their positions of control and authority as officers and/or directors of the Company, were able to, and did, directly and/or indirectly, exercise control over the business and corporate affairs of the Company, including the wrongful acts complained of herein and in the Securities Class Action.

131.    Accordingly, Defendants Lemonis, Wagner, and Kirn are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)) which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

132.    As such, the Company is entitled to receive all appropriate contribution or indemnification from Defendants Lemonis, Wagner, and Kirn.

133.    Plaintiff, on behalf of Camping World, has no adequate remedy at law.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Awarding money damages against all Individual Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, molded in a fashion to ensure the Individual Defendants do not participate therein or benefit thereby;

B.    Directing all Individual Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their

unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds, and imposing a constructive trust thereon;

C.      Directing Camping World to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its stockholders from a repeat of the damaging events described herein, including, but not limited to:

- strengthening the Board's supervision of operations and compliance with applicable state and federal laws and regulations;

- strengthening the Company's internal reporting and financial disclosure controls;

- developing and implementing procedures for greater shareholder input into the policies and guidelines of the Board; and

- strengthening the Board's internal operational control functions;

D.      Awarding costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.      Granting such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury on all claims set forth herein.

DATED: May 19, 2026

**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**

By:  */s/ Carl V. Malmstrom*
Carl V. Malmstrom
111 West Jackson, Suite 1700
Chicago, IL 60604
Telephone: (312) 984-0000
Email: malmstrom@whafh.com

46

47

**RIGRODSKY LAW, P.A.**
Vincent A. Licata
Leah B. Wihtelin
225 Broadway, Suite 3707
New York, NY 10007
Telephone: (212) 201-7690
Email: vl@rl-legal.com
Email: lw@rl-legal.com

*Counsel for Plaintiff*